## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MT. HAWLEY INSURANCE COMPANY,

      Plaintiff,

v.

EAST PERIMETER POINTE
APARTMENTS LP; VENTRON
MANAGEMENT, LLC; MIRANCE
WILDER; CONSTANCE IRIONS; and
ADRIAN JOHNSON,

      Defendants.

———————————————————

EAST PERIMETER POINTE
APARTMENTS LP; VENTRON
MANAGEMENT, LLC,

      Third-Party Plaintiffs,

v.

LEXINGTON INSURANCE COMPANY,

      Third-Party Defendant.

Case No. 1:18-cv-00367-TWT

## THIRD-PARTY DEFENDANT LEXINGTON INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Third-Party Defendant Lexington Insurance Company ("Lexington") files this Motion for Summary Judgment under Fed. R. Civ. P. 56 and Local Rule 56.1, and in support thereof states:

## I.    Summary of the Argument

This is an insurance coverage dispute arising out of an assault and murder at a Georgia apartment complex that turns on a single issue: whether Defendants East Perimeter Pointe Apartments LP ("EPPA") and Ventron Management, LLC ("Ventron") timely notified Lexington of these events, as they were required to do under the provisions of the Lexington policy.  EPPA and Ventron breached the notice provision of the Lexington policy because they did not notify Lexington of the assault or shooting for more than two years after learning of them, and did not notify Lexington of two separate lawsuits that had been filed against them for more than three months.  These delays are unreasonable as a matter of Georgia law, and the Lexington policy therefore does not afford coverage to EPPA or Ventron for the underlying lawsuits.  Accordingly, the Court should grant this motion and enter summary judgment in favor of Lexington.

## II.   Statement of Facts[1]

### A.   The Underlying Lawsuits

Marcus Wilder lived in an apartment complex owned by EPPA, located in Decatur Georgia, in December 2015.   (Ex. A, EPPA's Responses to Plaintiff's Second Interrogatories, ¶ 2; Ex. B, Incident Report; Dkt. 1-1, ¶ 5).   On December 26, 2015, Adrian Johnson was allegedly an invitee of Marcus Wilder and was inside his apartment when several assailants broke into the unit and beat Adrian Johnson.   (Dkt. 1-1 at ¶¶ 8-11; Ex. B).   Marcus Wilder allegedly went to visit Johnson in the hospital, and when he returned home to his apartment, one of the assailants was hiding in a closet.   (Dkt. 1-1 at ¶¶ 6-8; Ex. B).   The assailant burst out of the closet with a handgun and shot Marcus Wilder in the head.   (Dkt. 1-1 at ¶¶ 8-10; Ex. B). Marcus died just outside his apartment.   (Dkt. 1-1 at ¶11; Ex. B).

Two lawsuits were filed as a result of these events: *Miranda Wilder as Adminstratrix of the Estate of Marcus Wilder, Deceased, and Constance Irions as Natural Mother and Legal Guardian of London McKenzie Wilder, minor v. East Perimeter Pointe Apartments, LP, Ventron Management, LLC, Quenterius Jaquan Brown, and Jeffrey Tashawn Prince*, number 17A66597, pending in the State

---

[1] The exhibits referenced in this section are attached to Lexington's Statement of Facts, which is being filed contemporaneously herewith, and they are incorporated herein by reference.

Court of Dekalb County, Georgia (the "Wilder Action"); and *Adrian Johnson v. East Perimeter Pointe Apartments, LP, Ventron Management, LLC, Quenterius Jaquan Brown, and Jeffrey Tashawn Prince,* number 17A67222, pending in the State Court of Dekalb County, Georgia (the "Johnson Action").  (Dkt. 1-1; Dkt. 1-2).  The Wilder Action was filed on October 12, 2017, and the Johnson Action was filed on December 4, 2017.  (Dkt. 1-1, Dkt. 1-2).  Ventron was served with the complaint in the Wilder Action on November 8, 2017, and EPPA was served on October 17, 2017.  (Ex. C, Nov. 8, 2017 Email; Ex. D, Affidavits of Service).

The plaintiffs allege that EPPA and Ventron operated, managed, and secured the East Perimeter Pointe Apartments at the time of the shooting.  (Dkt. 1-1, ¶ 4; Dkt. 1-2, ¶ 7).  In the Wilder Action, the plaintiffs allege causes of action for negligence, joint venture liability, public nuisance, and punitive damages.  See generally Dkt. 1-1.  The Wilder complaint alleges that the EPPA and Ventron had constructive knowledge of criminal activity on the property before the shooting, and they allowed it to continue.  Id. at ¶¶ 12, 16, and 17.  The Wilder plaintiffs further allege that EPPA and Ventron negligently maintained, inspected, secured, and managed the property—creating an unreasonable risk of injury to apartment residents and their guests.  Id. at ¶¶ 16-21. The Wilder plaintiffs allege that EPPA and Ventron negligently supervised, hired, trained, and retained their employees

because EPPA and Ventron knew or should have known ab out the dangerous environment of the property.  Id. at ¶ 31.

The complaint in the Johnson Action largely mirrors the complaint in the Wilder Action, and was filed by the same attorneys.  See generally Dkt. 1-2. Johnson seeks damages for the injuries he allegedly sustained when he was beaten in Marcus Wilder's apartment.  Id. at ¶¶ 10-17.  His complaint alleges causes of action for negligence, joint venture liability, punitive damages, nuisance, assault, battery, and intentional infliction of emotional distress.  See generally Dkt. 1-2.

**B.      The Lexington Policy**

Lexington issued a commercial umbrella liability policy to WCPP Risk Purchasing Group, Inc., A California Corporation, Western Consolidated Premium Properties, Inc., a California Corporation, WCPP II ("WCCP"), with effective dates of December 15, 2015, to December 15, 2016 (the "Lexington Policy"). (Dkt. 90-3).  WCCP is a risk purchasing group, which is a mechanism used to insure multiple entities with different owners under a single insurance policy. (Dkt. 90, Depo. Sue Williams, 35:17-25; 52:8-25).[2]  WCCP does not own any of the properties insured under the Lexington Policy.  Id. at 53:5-10.  The Lexington

---

[2] M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc., 845 F.3d 313, 315 (7th Cir. 2017) ("WCCP is a risk purchasing group through which the owners or managers of commercial property can purchase insurance.").

Policy insures more than 800 properties, the majority of which are located outside of California.  Id. at 51:2-20; Dkt. 1-3 and 1-4.

The Lexington Policy provides that Lexington "will pay on behalf of the 'Insured' those sums in excess of the 'Retained Amount' that the 'Insured' becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies."  (Dkt. 90-3, § I(A)).

Lexington has the right and duty to defend any "suit" against the "Insured" that seeks damages for "bodily injury" if: (1) the total applicable limits of "scheduled underlying insurance" and any "other insurance" have been exhausted by the payment of damages; or (2) "the damages sought because of 'bodily injury' . . . would not be covered by 'scheduled underlying insurance' . . . even if the total applicable limits of . . . the 'scheduled underlying insurance' . . . had not been exhausted by the payment of damages."   Id. at § II(A).  The Lexington Policy applies only in excess of the total applicable limits of "scheduled underlying insurance" and any other applicable "other insurance," "whether or not such limits are collectible."  Id. at § IV(F).

Under the notice provisions of the Lexington Policy:

1.    You must see to it that we are notified as soon as practicable of an "occurrence" that may result in a claim or "suit" under this policy. To the extent possible, notice should include:

      a.     How, when and where the "occurrence" took place;

      b.     The names and addresses of any injured persons and any witnesses; and

      c.     The nature and location of any injury or damage arising out of the "occurrence."

2.     If a claim is made or "suit" is brought against any "Insured" which is reasonably likely to involve this policy, you must notify us in writing as soon as practicable on the assumption that an "Insured" is liable for the damage claimed. . . .

3.     You and any other involved "Insured" must:

      a.     Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      b.     Authorize us to obtain records and other information;
      c.     Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

      d.     assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the "Insured" because of injury or damage to which this insurance may also apply.

Id. at § VI(G). No insured can sue Lexington under the Lexington Policy "unless all of its terms have been fully complied with." Id. at § VI(I).

The Lexington Policy defines "Insured" to include "Any person (other than your 'employee' or 'volunteer worker') or organization while acting as your real estate manager." Id. at § V(J)(2)(c). In addition, "Insured" includes anyone

included as an additional insured under "scheduled underlying insurance," but not for broader coverage than is provided by that insurance.  Id. at § V(J)(2)(e).

The Lexington Policy was delivered to R.T. Specialty, LLC, in Atlanta, Georgia.  (Ex. E, Lexington's Responses to EPPA's First Interrogatories, ¶¶ 4-5; Dkt. 90, 53:23 – 54:4).  R.T. Specialty was a wholesale broker, which is an intermediary between a retail agent and an insurance company.  (Dkt. 90, 10:14-19). A retail agent is someone who has a relationship with the actual insured that buys the insurance policy.  Id. at 11:10-13.  M.G. Skinner and Associates was the retail agent for WCCP.  Id. at 12:19-24.  Lexington sent a copy of the Lexington Policy to R.T. Specialty in Georgia, and R.T. Specialty then sent a copy of the Lexington Policy from Florida to M.G. Skinner (as agent of WCCP) in California. Id. at 18:1-4; 26:9-18; 53:23-54:4.

The apartment complex at which Wilder was murdered and Johnson was assaulted is listed as a named insured and covered location in the insurance policy issued by Plaintiff.  (Dkt. 1-4, p. 14, #625).  Plaintiff's policy is identified as "scheduled underlying insurance" in the Lexington Policy.  (Dkt. 90-3, "Schedule of Underlying Insurance.").  EPPA owns the apartment complex, and it contracted with Ventron to manage it.  (Ex. A, ¶ 2; Ex. F, Property Management Agreement).

EPPA and Ventron contend that they are insureds under the Lexington Policy. (Dkt. 21, ¶ 11; Dkt. 22, ¶ 8).

### C.   Notice

EPPA and Ventron learned of the shooting almost immediately after it occurred.  (Ex. B; Ex. G, Individual Defendants' Responses to Interrogatories, ¶ 2; Ex. H, EPPA's Responses to Mt. Hawley's First Request for Admissions, ¶ 6; Ex. I, Ventron's Responses to Mt. Hawley's First Request for Admissions, ¶ 6). Ventron compiled an "incident report form" on December 26, 2015, less than twelve hours after the shooting, which described the "Murder and Burglary" at Marcus Wilder's apartment.   (Ex. B).   Miranda Wilder contacted EPPA on December 26, 2015, and spoke to someone identified as a "manager" of the apartment complex to ask about obtaining Marcus Wilder's belongings.  (Ex. G, ¶ 2).

On January 11, 2016, Ventron received a letter of representation from an attorney who represented Constance Irons on behalf of Marcus Wilder.  (Ex. J, Letter).  The letter was sent via certified mail, and the return receipt was signed by Deidra Baitey, who at the time was a leasing agent employed by Ventron at Embarcadero Club, the address listed on the return receipt.  (Ex. K, Ventron's Responses to Third Interrogatories, ¶ 1).  Ventron did not notify Mt. Hawley or

Lexington of Wilder's murder or the assault of Johnson until after the Wilder Action and Johnson Action were filed because Ventron did not believe it would not face liability for these incidents.  (Ex. I, ¶ 5).

EPPA also did not notify Mt. Hawley or Lexington of the shooting until 2018 because it contends that, as the property owner, it had no duty to notify these insurers.  (Ex. H, ¶ 5).  In addition, EPPA did not believe that the shooting and burglary would result in liability on the part of EPPA.  Id.

Lexington was first notified of the incident and the underlying lawsuits on February 20, 2018, more than two years after the shooting, more than three months after Ventron was served with the complaint in the Wilder Action, and more than four months after EPPA was served with the complaint in the Wilder Action.  (Ex. L, Feb. 20, 2018 Email; Ex. C; Ex. D; Ex. M, Declaration of Charles Creamer, ¶ 5).

## III.   <u>Argument</u>

### A.   **Legal Standard**

Summary judgment is appropriate where the pleadings and evidence show that there is no genuine issue as to any material fact and that Lexington is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  To prevail on its motion, Lexington must demonstrate that EPPA and Ventron lack evidence to support at

least one essential element of their third-party claims against Lexington. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Once this burden is met, EPPA and Ventron must present competent evidence establishing "specific facts showing that there is a genuine issue for trial" <u>Id.</u> at 324.

**B.    Georgia law applies.**

Georgia law governs the Lexington Policy regardless of whether it was delivered in Georgia or California.  Where jurisdiction is based on diversity, the court must apply the choice of law rules of the forum state. <u>Shorewood Packaging Corp. v. Commercial Union Ins. Co.</u>, 865 F. Supp. 1577, 1578 (N.D. Ga. 1994). "With regard to insurance contracts, Georgia law provides that the last act essential to the completion of the contract is delivery; consequently, insurance contracts are considered made at the place where the contract is delivered."  <u>Johnson v. Occidental Fire & Cas. Co. of N. Carolina</u>, 954 F.2d 1581, 1584 (11th Cir. 1992). This rule does not apply if the state of delivery lacks a substantial relationship to the parties or transaction.  <u>Id.</u>  In addition, Georgia will apply the law of another state only if that state has a statute addressing the particular question at issue. <u>Coon v. The Medical Center, Inc.</u>, 797 S.E.2d 828, 834 (Ga. 2017).  "In the absence of a statute, however, at least with respect to a state where the common law is in force, a Georgia court will apply the common law as expounded by the

courts of Georgia." Id.; see also Frank Briscoe Co. v. Georgia Sprinkler Co., 713 F.2d 1500, 1503 (11th Cir. 1983) ("When no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law."); Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 n.6 (11th Cir. 1987).

This Court and other Georgia federal courts consistently applied this limitation on the application of foreign law for many years in insurance and non-insurance cases before the Georgia Supreme Court's decision in Coon,[3] and they continue to do so after that decision. Renaissance Recovery Sols., LLC v. Monroe Guar. Ins. Co., 2017 WL 4018861, at *14 (S.D. Ga. Sept. 12, 2017) (applying Georgia law to policies delivered in Michigan because there was no applicable Michigan statute); Massachusetts Bay Ins. Co. v. Fort Benning Family Communities, LLC, 2017 WL 2129909, at *1 (M.D. Ga. May 15, 2017) (holding that Georgia law applied to insurance policies delivered in Maryland because there was no Maryland statute on point); see Reichwaldt v. Gen. Motors LLC, 304 F.

---

[3] See Frank Briscoe Co., 713 F.2d at 1503; In re Tri-State Crematory Litig., 215 F.R.D. 660, 678 (N.D. Ga. 2003); Shorewood Packaging Corp., 865 F. Supp. at 1581; Briggs & Stratton Corp. v. Royal Globe Ins. Co., 64 F. Supp. 2d 1340, 1344 (M.D. Ga. 1999); Singletary v. Se. Freight Lines, Inc., 832 F. Supp. 1552, 1556 (N.D. Ga. 1993); Bradham v. Randolph Trucking Co., 775 F. Supp. 395, 397 (M.D. Ga. 1991), aff'd, 960 F.2d 1018 (11th Cir. 1992); Trusted Data Sols., LLC v. Kotchen & Low, LLP, 2015 WL 11251959, at *3 (N.D. Ga. Feb. 6, 2015); Nat'l Fire Ins. Co. of Hartford v. Centraarchy Rest. Mgmt. Co., 2009 WL 10670653, at *2 (N.D. Ga. Sept. 8, 2009); McChesney v. Old Republic Nat'l Title Ins. Co., 2008 WL 11320039, at *13 (N.D. Ga. Feb. 12, 2008).

Supp. 3d 1312, 1315 (N.D. Ga. 2018) (in a tort case, applying Georgia law despite accident occurring in Nebraska under exception where there is no statute on point); Fed. Express Corp. v. Petlechkov, 2017 WL 6460261, at *2 (N.D. Ga. Dec. 18, 2017) (in tort case where injury suffered in Tennessee, holding that "[s]ince no Tennessee statute is involved, the Court will apply Georgia law.").

In this case, there is no California statute addressing untimely notice; it is a common law doctrine. See UNUM Life Ins. Co. of Am. v. Ward, 526 U.S. 358, 368 (1999); Pitzer Coll. v. Indian Harbor Ins. Co., 845 F.3d 993, 996 (9th Cir. 2017). "Upon acquiring statehood in 1850, California adopted the common law of England as the rule of decision in its courts when not inconsistent with the Federal or State Constitutions or State legislation." United States v. Gerlach Live Stock Co., 339 U.S. 725, 744 (1950). The common law remains in effect today unless it conflicts with a statute or the Constitution, Cal. Civ. Code § 22.2, and timely notice under an insurance policy is a common law issue.

Accordingly, California is "a state where the common law is in force" as stated in Coon—at least with respect to the issue of timely notice under insurance policies, and because California has no statute addressing late notice, Georgia law applies. Coon, 797 S.E.2d at 834. This is particularly true here, where the named insured, WCCP, is a risk purchasing group that does not own any of the properties

- 13 -

insured under the Lexington Policy.  The risk insured by the Lexington Policy is the EPPA apartment complex, which is located in Georgia, and the Lexington Policy was delivered to R.T. Specialty in Georgia.  Consequently, the state of California has no relationship to EPPA, Ventron, or Lexington—let alone a substantial relationship.  Under these circumstances, Georgia law controls.

## C.  EPPA and Ventron breached the notice provisions of the Lexington Policy.

### 1.  Notice of an occurrence that may result in a claim.

The Lexington Policy requires notice as soon as practicable of an occurrence "that may result in a claim or 'suit' under [the] policy."  Under Georgia law, if a notice provision is expressly made a condition precedent to coverage, the insured must comply with it unless the insured demonstrates that its failure to comply was justified. E.g., Plantation Pipeline Co. v. Royal Indem. Co., 537 S.E.2d 165, 169 (Ga. App. 2000). The insurer does not have to prove that it was prejudiced by the insured's breach of the notice provision if notice is a condition precedent to coverage. N. River Ins. Co. v. Gibson Tech. Servs, Inc., 116 F. Supp. 3d 1370, 1380 (N.D. Ga. 2014); Johnson & Bryan, Inc. v. Utica Mut. Ins. Co., 741 F. App'x 722, 726 (11th Cir. 2018).  Because the Lexington Policy forbids suit against Lexington unless the insured has complied with all of the terms of the Lexington Policy, the notice provision is a condition precedent to coverage.  Barclay v.

Stephenson, 787 S.E.2d 322, 329 (Ga. App. 2016).  Here, Ventron and EPPA's more than two-year delay in notifying Lexington of the assault and murder violated the notice provisions of the Lexington Policy as a matter of law.

This Court addressed an identical notice provision in an umbrella policy in N. River Ins. Co., 116 F. Supp. 3d at 1370.  There, the insured (Gibson) contracted to provide telecommunications services for Comcast and then subcontracted the work to another entity (Pheckvision), which in turn subcontracted the work to still another entity (Boz), which actually performed the work for Comcast.  Id. at 1371.  In June 2007, while traveling home from work, an employee of Boz caused an auto accident resulting in the death and injury of various passengers in another vehicle.  Gibson was informed of the accident at the time but did not investigate—allegedly learning only that the employee of Boz would miss work.  Id. at 1372.

In March 2008, the injured parties sued Boz, its employee, and Comcast, and three months later Comcast demanded defense and indemnity for the accident from Gibson, providing a copy of the police report and the Complaint. Comcast at the same time demanded that Gibson notify its insurance carriers of the suit.  Id. Gibson chose not to notify its excess carrier (North River) either of the accident or Comcast's demand for defense and indemnity because the accident involved a subcontractor of a subcontractor, and based on an understanding that Pheckvision

- 15 -

or an insurer of Pheckvision would be "handling the matter." At this time, Gibson "did not see that it was involved," despite learning in 2008 that it could be added as a defendant to the suit. Id. at 1373.

In October 2008, Comcast again demanded defense and indemnity from Gibson. Communications ensued between and among Gibson, its insurance broker, and a third party claims administrator ("TPA"), but notice was still not provided to North River at this time. Id. at 1373. For three years, the TPA's indemnity reserve remained at "token levels" of approximately $1,000 (reflecting a prediction of "zero liability" for Gibson) based on Gibson's representations that Pheckvision would absolve Gibson from liability. Id. Although Gibson attempted to locate the contract specifying the relative obligations between Pheckvision and Gibson, as of January 2009 it could not be found, and it was never located. Nonetheless, Gibson's broker advised the TPA that Gibson would be "okay" when it was revealed that the Boz employee was on his way home in a personal truck and outside the service area when the accident happened. Notice was still not provided to North River. Id.

In July 2009, Gibson and Pheckvision were added to the suit and Gibson retained legal counsel who advised Gibson to immediately notify North River. Gibson still did not do so; the TPA continued to assess Gibson's liability as

doubtful; and defense counsel maintained between the fall of 2009 and 2012 that Gibson's exposure was low. Comcast and Gibson were denied summary judgment in the suit in late 2012, at which point Gibson determined that it was "reasonably likely" the excess coverage of the North River policy would be needed. Id. at 1374.

North River ultimately learned of the accident and the suit in November 2012 from Comcast, and at some point thereafter from Gibson's broker. The matter was ultimately settled with a contribution by North River but with a reservation of rights to litigate North River's coverage obligations based upon the timeliness of notice.  Id. at 1374-75.  In the coverage litigation, Gibson contended that its assessment of the liability and lack of need for notice to North River controlled unless it was manifestly unreasonable; that the timing of the notice to North River was in fact reasonable; and that even if notice was untimely, North River had no basis for non-coverage because it admitted the settlement was reasonable, did not show that it would have done anything differently had it received notice, and it was not prejudiced.  Id.

 The Court disagreed in all respects.  Id. at 1378.  First, the Court concluded that Gibson learned of the details of the accident in June 2008 and was obliged to "see to it" that North River received notice of any "Occurrence" which may result

in a claim or "Suit" under the Policy, rejecting Gibson's claim that the North River notice provision did not contain a timeliness requirement. Because Gibson learned about the accident, understood that it may result in a suit, and the notice provision was a condition precedent to coverage, Gibson was required to give notice "as soon as reasonably possible." Id. at 1379.

According to the Court, "[t]he … provision would be pointless if the court were to accept Gibson's interpretation that notice about an 'Occurrence' could have been provided at any time." Id. The Court furthermore noted that Gibson never investigated its potential exposure, and based solely on the belief of the company's CFO, concluded that Gibson would not be "tied into th[e] accident." This, combined with the fact that Gibson did not begin looking for the indemnification contract with Pheckvision until October 2008 (which was not located), and did not seek legal advice until 2009, evidenced a failure to exercise due diligence or to take "appropriate steps to make an informed judgment regarding the nature and amount of the claim" as required by Georgia law.   Id.

As a matter of law, the court found a lack of due diligence in providing notice, and that Gibson's offered justifications for delay were unreasonable as a matter of law. The court furthermore found that it was irrelevant that North River did not suffer any prejudice as a result of the late notice. Id. at 1380.

The notice provision of the Lexington Policy is identical to the one at issue in <u>North River</u>, and the reasoning of that case applies equally here. It is undisputed that neither Ventron nor EPPA notified Lexington of the murder or the assault for more than two years, until after the lawsuits were filed, despite knowing that one of their residents was murdered on site and that several individuals had been arrested as part of the investigation. Under similar circumstances, Georgia courts have held that delays of as little as eight months violated a notice provision as a matter of law. <u>Richmond v. Ga. Farm Bureau Mut. Ins. Co.</u>, 231 S.E.2d 245 (Ga. App. 1976) (eight months after car accident.); <u>Maryland Casualty Co. v. Salon Avenue Suite 2</u>, 2014 WL 4925623 (N.D. Ga. 2014) (eight months after incident); <u>Dillard v. Allstate Ins. Co.</u>, 245 S.E.2d 30 (Ga. App. 1978) (nine months after accident); <u>Snow v. Atlanta Int'l Ins. Co.</u>, 354 S.E.2d 644 (Ga. App. 1987) (ten months after car accident); <u>Protective Ins. Co. v. Johnson</u>, 352 S.E.2d 760, 761 (Ga. 1987) (seventeen months after injury); <u>Lankford v. State Farm Mut. Auto. Ins. Co.</u>, 703 S.E.2d 436, 439 (Ga. App. 2010) (almost two-year delay after car accident).

The Court should grant this motion and enter judgment in favor of Lexington finding that the Lexington Policy does not afford coverage for the

Wilder Action or the Johnson Action because EPPA and Ventron breached the notice provisions of the Lexington Policy as a matter of law.

### 2.   Notice of the underlying lawsuits.

The Lexington Policy also requires the insured to immediately send Lexington a copy of any legal papers received by the insured if the claim or suit is reasonably likely to involve the Lexington Policy.  "Georgia courts have held that a delay of as little as three months between the filing of a lawsuit and notice to the insurer is unreasonable as a matter of law."  N. River Ins. Co., 116 F. Supp. 3d at 1378.  The Eleventh Circuit has held that a four-month delay in notifying an excess insurer was unreasonable as a matter of Georgia law.  State Farm Fire & Cas. Co. v. LeBlanc, 494 F. App'x 17, 23 (11th Cir. 2012).

In this case, the Wilder Action was filed on October 12, 2017, and the Johnson Action was filed on December 4, 2017.  (Dkt. 1-1; Dkt. 1-2).  EPPA was served with the Wilder Action on October 17, 2017, and Ventron was served on November 8, 2017.  (Ex. D).  The Wilder Action seeks damages for the alleged wrongful death of Marcus Wilder, including punitive damages.  (Dkt. 1-1).  The Johnson Action seeks damages for the injuries Johnson allegedly sustained when he was beaten by the assailants in Wilder's apartment, including punitive damages.  (Dkt. 1-2).  And as noted above, Ventron and EPPA knew about the murder and

assault for more than two years before these lawsuits were filed.  Plaintiff's policy has a limit of $1,000,000 per occurrence and $2,000,000 in the aggregate.  (Dkt. 1-3, p.3).  Under these circumstances, EPPA and Ventron's months-long delay in notifying Lexington of the Wilder Action and Johnson Action is unreasonable as a matter of law.  LeBlanc, 494 F. App'x at 23; Diggs v. S. Ins. Co., 321 S.E.2d 792, 793 (Ga. App. 1984) (affirming summary judgment in favor of insurer where insured waited three months to notify the insurer of a lawsuit filed against him).

Accordingly, the Court should grant this motion and enter judgment in favor of Lexington finding that the Lexington Policy does not afford coverage for the Wilder Action or the Johnson Action because EPPA and Ventron breached the notice provisions of the Lexington Policy as a matter of law

### D.     EPPA and Ventron cannot justify the delay.

EPPA and Ventron admit that they did not notify Lexington of the murder or fight for more than two years because neither believed that they might be liable for Johnson's injuries or Wilder's death.  Under Georgia law, however, an insured's justification for failure to comply with a notice provision cannot be based on the insured's conclusion that it is free from fault or not liable to the other party.  N. River Ins. Co., 116 F. Supp. 2d at 1378; Bituminous Cas. Corp. v. J.B. Forrest & Sons, Inc., 209 S.E.2d 6, 9 (Ga. App. 1974).  EPPA's further contention that as the

property owner, it had no duty to notify Lexington, is also insufficient because EPPA contends that it is an insured under the Lexington Policy, (Dkt. 21, ¶ 11), and as purported insured, EPPA had a duty to notify Lexington of occurrence that may result in a claim.  An insured's ignorance of policy provisions cannot excuse untimely notice.  <u>Johnson</u>, 352 S.E.2d at 761.

Accordingly, Ventron and EPPA cannot satisfy their burden to excuse their failure to comply with the notice provisions of the Lexington Policy as a matter of law.

## IV.   <u>Conclusion</u>

The Court should grant this motion, enter summary judgment in favor of Lexington, and hold that coverage is not afforded by the Lexington Policy to EPPA or Ventron for the Wilder Action or the Johnson Action.

WHEREFORE, Lexington respectfully requests that this Court grant this motion, enter summary judgment in favor of Lexington, hold that coverage is not afforded by the Lexington Policy to EPPA or Ventron for the Wilder Action or the Johnson Action, and award any other relief the Court deems appropriate.

This 22nd day of January, 2019.

WEINBERG, WHEELER, HUDGINS
GUNN & DIAL, LLC

/s/ Stephen J. Rapp
John C. Bonnie
Georgia Bar No.: 067540
Stephen J. Rapp
Georgia Bar No.: 103806
3344 Peachtree Road, Suite 2400
Atlanta, Georgia 30326
404.876.2700 (tel) / 404.875.9433 (fax)
srapp@wwhgd.com
jbonnie@wwhgd.com
*Attorneys for Lexington Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2019, I electronically filed the foregoing motion via the CM/ECF system, which will automatically send e-mail notification of such filing upon all parties to this matter.

/s/ Stephen J. Rapp
Stephen J. Rapp
Georgia Bar No. 103806